WILLIAM H. THOMAS (ISB 3154)
DANIEL E. WILLIAMS (ISB 3920)
THOMAS, WILLIAMS & PARK, LLP
225 N. 9th Street, Suite 810
P.O. Box 1776
Boise, ID  83701-1776
Telephone:  (208) 345-7800
Fax:  (208) 345-7894
wmthomas@thomaswilliamslaw.com
danw@thomaswilliamslaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF IDAHO

| | |
|---|---|
| JAMES H. RAO, M.D., an individual, and JHHR MEDICAL ASSOCIATES, LLC. f/k/a/ JHHR MEDICAL ASSSOCIATES, PLLC, an Idaho limited liability company, | Case No. |
| Plaintiffs, | **COMPLAINT WITH DEMAND FOR JURY TRIAL** |
| vs. | |
| ST. LUKE'S MAGIC VALLEY REGIONAL MEDICAL CENTER, LTD, an Idaho nonprofit corporation, BRIAN FORTUIN, M.D., an individual, and DARYL G. FICKLIN, D.O., an individual | |
| Defendants. | |

Plaintiffs, James H. Rao, M.D. ("Dr. Rao") and JHHR Medical Associates, LLC ("Company") through their counsel, for their claims against St. Luke's Magic Valley Regional Medical Center, Ltd, ("SLMV"), Brian Fortuin, M.D. ("Fortuin") and Daryl G. Ficklin, D.O. ("Ficklin") allege:

COMPLAINT AND JURY DEMAND, Page | 1

## INTRODUCTION

1.      Plaintiffs sue Defendants SLMV, Fortuin and Ficklin for violations of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e, *et seq.*; violations of 42 U.S.C. § 1981; breach of contract; breach of the covenant of good faith and fair dealing; and reputational disparagement.  Plaintiff, Dr. Rao, is Chinese-American.  Dr. Rao alleges Defendant SLMV created, maintained and failed to correct a known hostile work environment based on race and national origin and terminated his employment and the Company's Professional Services Agreement for his reports of unlawful discrimination.  Dr. Rao claims Ficklin individually defamed and disparaged Dr. Rao; tortiously interfered with Dr. Rao's contracts; and, tortiously interfered with Dr. Rao's prospective advantages.  Plaintiffs seek all remedies including equitable relief, damages, attorneys' fees, costs and interest.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction under 28 U.S.C. § 1331.

3.      The acts alleged occurred in Twin Falls County, Idaho and caused the claims. The employment practices alleged to be unlawful were committed in this jurisdiction and venue is proper in the Southern Division of the District of Idaho under 28 U.S.C. § 1391(a) (3) and under Dist. Idaho Loc. Civ. R. 3.1.

## PARTIES

4.      Plaintiff, Dr. James Rao, resides in Twin Falls County, Idaho, and was employed by Defendant SLMV under written contracts beginning in July 2010 and ending in February 2017.

5.      Plaintiff JHHR Medical Associates, LLC is an Idaho limited liability company with its headquarters in Twin Falls, Idaho.  Dr. Rao is a member of the Company.

6.      Defendant, St. Luke's Magic Valley Regional Medical Center, Ltd. ("SLMV") is an Idaho nonprofit corporation, doing business at 801 Pole Line Road West, Twin Falls, Idaho.

7.      Defendant, Daryl G. Ficklin, D.O. is a physician employed by SLMV and, upon information and belief, resides in Twin Falls, Idaho.

8.      Defendant, Brian Fortuin, M.D., is a physician employed by SLMV and, upon information and belief, resides in Twin Falls, Idaho.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      Plaintiff, Dr. Rao, timely filed a charge of discrimination with the Idaho Human Rights Commission ("IHRC") and concurrently with the Equal Employment Opportunity Commission ("EEOC") on December 12, 2017, in which he claimed Defendants violated Title VII based on his race, Asian, and national origin, Chinese-American.  Dr. Rao was discriminated and retaliated against and Respondent wrongfully terminated his contract because he complained of his race and national origin discrimination.  Over 180 days have passed since Dr. Rao filed his charge of discrimination.  Dr. Rao has requested that the EEOC and the IHRC issue a notice of right to sue.

10.      In addition, Dr. Rao has exhausted and complied with any conditions precedent required by his employment relationship with SLMV by engaging in good faith negotiations and a mediation with SLMV.

## FACTUAL ALLEGATIONS

11.      Dr. Rao is a medical doctor, board certified in Internal Medicine.  He obtained his B.S. in Biology from Florida State University and his M.D. degree from University of South

Florida College of Medicine.  He completed his Internal Medicine residency training at Emory University School of Medicine.

12.     On or about July 27, 2010, Dr. Rao and SLMV signed a written employment agreement under which Dr. Rao agreed to provide professional internal medicine services as a hospitalist for SLMV in Twin Falls.   Dr. Rao started these services on or about September 12, 2010.

13.     From September 2010 through 2012, Dr. Rao served as SLMV's Hospitalist Medical Director ("HMD").

14.     During his tenure as HMD, Dr. Rao intervened in several complaints brought against nurses and physicians by SLMV's ICU (Intensive Care Unit) Manager, Chris McFall ("McFall") and SLMV's ICU Medical Director, Dr. Greg Ball ("Ball").

15.     In one instance, McFall and Ball accused two nurses of negligent patient care. McFall and Ball asked Dr. Rao to agree with their allegations against the nurses.  Dr. Rao refused to side with McFall and Ball.  Dr. Rao, through his own observation and participation in the patient's care, confirmed that the nurses' treatment of the patient was appropriate and cleared them of any wrongdoing.

16.     During 2010 and into 2011, McFall regularly complained about one physician's slow responses to his patients, the physician's ignorance of ICU treatment protocols and his questionable medical practices.

17.     Dr. Rao spoke with the physician about whom McFall complained, who explained that his medical school's ICU protocols were superior to SLMV's.  Dr. Rao helped the physician explain his rationale to McFall and Ball.  Ultimately SLMV adopted the guidelines advocated by that physician and Dr. Rao.

18.     Dr. Rao's intervention in the ICU protocol incident generated additional animosity from McFall and Ball towards Dr. Rao.

19.     During his tenure as HMD, Dr. Rao instituted many positive changes to SLMV, including a major expansion of hospitalist services.  Some changes included taking over the medical care of patients normally serviced by orthopedics, gastroenterology, nephrology and most of cardiology's congestive heart failure patients.  These changes freed up clinic and procedure time for these specialists.

20.     During his tenure as HMD, Dr. Rao, along with Debbie Kytle, SLMV's Administrator for Physician Services ("Kytle"), hired several competent physicians and physician extenders.  The Hospitalist Department grew from four physicians to eight and from one nurse practitioner to two.

21.     During his tenure as HMD, 2010-2012, Dr. Rao recognized that SLMV's appetite for expansion was putting patient safety and quality of patient care at risk.  In Dr. Rao's opinion, SLMV had no experienced nursing staff and did not have appropriate specialists on staff or on call.  Dr. Rao observed that national guidelines were not followed.

22.     During his tenure as HMD, Dr. Rao observed that critically ill patients who needed higher level of care were kept unusually longer at SLMV or were transferred to other St. Luke's hospitals farther away rather than one of St. Luke's closer competitors.

23.     One example of the effect of SLMV not having trained specialists involved the treatment of stroke patients.  A stroke patient who came to SLMV would receive a clot-busting medication, tPA (tissue plasminogen activator) and be admitted to SLMV's ICU without being examined by a neurologist.  There is a high risk of life-threatening intracranial hemorrhage after a patient receives tPA.  Dr. Rao observed that this occasionally occurred at SLMV and the

patients rarely survived because the life-saving surgery, which is a craniotomy to alleviate intracranial pressure, can only be performed by a neurosurgeon.  At the time, the closest neurosurgeon was at least an hour or two away from SLMV.

24.     Dr. Rao advocated for more full-time pulmonology, intensivist (a physician who specializes in the care of critically ill patients in the ICU) and neurology coverage.  During a meeting with the entire Hospitalist Department, Kytle and Fortuin explained that SLMV did not want to add these specialists because they would compete with Ball and reduce his income.

25.     On or about December 9, 2011, Dr. Rao received a positive performance appraisal rating.

26.     Dr. Rao's actions to appropriately appraise, defend and evaluate colleagues from unwarranted claims of negligence and his advocacy for adding trained specialists generated extreme resentment from ICU physicians, ICU administration and charge nurses, which contributed later to the exponential growth of serious, personal and malicious complaints.

27.     On or about April 8, 2012, Dr. Rao resigned as HMD.

28.     In April 2015, Dr. Rao was working the night shift.  During these shifts, physicians could rest in a private area with a door code.  If the physician on night duty was needed, the protocol was for a nurse to call the doctor on a phone.  Otherwise, the nurses would call the hospitalist nurse practitioner first.  Some ICU staff treated Dr. Rao differently than the non-Chinese physicians.  They would bang on the door or use the keypad to enter uninvited.  Once, Dr. Rao told the nurse to wait while he put his pants on.  Dr. Rao reported this discriminatory treatment to Dr. Randy Skeem.  Dr. Skeem explained the staff would not do that to him, but they did it to Dr. Rao because he was "different," because he was Chinese.

29.     Fortuin, after learning of the pants incident, told Dr. Rao he "really didn't care that you Chinese people like to sleep in the nude." Dr. Rao had not. Dr. Rao explained that he was being treated differently because he was Chinese. Fortuin then told Dr. Rao, "[p]erhaps people like you don't belong here if you keep causing trouble." Fortuin warned Dr. Rao that another Chinese-American surgeon employed by SLMV had been let go. Fortuin told Dr. Rao to stop causing trouble, suggesting Dr. Rao would suffer the same consequences as the other Chinese-American physician.

30.     Ficklin had complained to Dr. Rao about having to host high school exchange students from China. Ficklin said that the Chinese were all deceitful, rude and arrogant and those traits were part of the Chinese culture. Ficklin said he would trust no Chinese person, just like he would trust no Chinese-made products.

31.     In April 2015, after the pants incident described above, Dr. Rao was called to a meeting in Kytle's office to discuss a complaint. Dr. Rao was led to believe the meeting was to be only with Kytle. Instead, he arrived to find Fortuin and Dr. Kurt Seppi (SLMV's System Chief Medical Officer) ("Dr. Seppi"). Allegra Thompson (SLMV human resources) ("Thompson") participated in the meeting through teleconferencing. Kytle was not present. They told Dr. Rao that an ICU nurse had complained about the events surrounding the pants incident. Dr. Rao was not shown the written complaint, but he explained the circumstances to the group. Fortuin had discussed this incident with Dr. Rao. Dr. Rao asked to see the written complaint. SLMV never gave it to him.

32.     As a solution to the complaint, Dr. Seppi and Thompson told Dr. Rao he should

go through PULSE.[1]  Dr. Seppi and Thompson implied that if Dr. Rao did not participate in a

PULSE program, SLMV would terminate his employment.

33.     After the April 2015 meeting, Dr. Rao followed up with Fortuin to review the

actual details of the complaints against him and asked to see the written complaints.  Fortuin

promised to provide the written complaints.  Eventually, Fortuin agreed to meet with Dr. Rao in

July 2015 in Kytle's office.

34.     July 2015, Dr. Rao went to Kytle's office to meet with Fortuin.  In Fortuin's

place, Ficklin and Dr. Miciak were present.  They refused to show Dr. Rao the written

complaints.  Ficklin became extremely antagonistic towards Dr. Rao.  Dr. Rao was concerned

about SLMV's objectiveness and realized he was being discriminated against because he was

Chinese-American.

35.     On July 16, 2015, Dr. Rao emailed Thompson and Kytle to explain his frustration

with the meeting and reported that he was being discriminated against.  Dr. Rao's email to

Thompson said in part:

>       I thought that Fortuin would have shared this with you.  He arranged a meeting
>       between Dr. Ficklin (Chair of Medicine Dept.), Dr. Miciak (Med Dir of Hospitalist Svc)
>       and me on Tuesday, after I requested an opportunity to go over the original complaints
>       against me.  As unbelievable as it is, I have never seen or read the actual written
>       complaints, and I was never given an opportunity to respond.  As you know, at my
>       meeting with Dr. Seppi, Fortuin (in Debbi Kytle's office) and you (on the phone), we
>       were supposed to review those complaints, but the specifics of those issues never came
>       up.  I asked Fortuin to hold off my participation of the PULSE program, until I have had
>       a chance to address these complaints.  Up until now, I am still unaware of the scope of
>       the complaints, or the specifics, other than the limited information of a few situations that
>       Dr. Fortuin was willing to share over the phone; and I still have not had a chance to
>       review or respond.

---

[1] The PULSE 360 is a system designed to provide those in the medical field with feedback,
training and coaching to identify ways to improve.

**You know from our meeting that I voiced my concern that I am unfairly targeted, and walked away from my meeting with Drs. Ficklin and Miciak more convinced than ever that I am discriminated against because of my national origin. There is no other explanation for it, from the viciousness of the complaints, collusion amongst staff (including some of my physician colleagues) and the selectiveness of their targets.  In addition, St Luke's did not verify the facts or ask for my response before turning against me.  None of my other colleagues were treated the same way.**

Ficklin has agreed to look into a few easily-verifiable facts (e.g. timing of phone calls), and to make available to me copies of those complaints (which I haven't received). If the facts are as described, I will participate in PULSE voluntarily.  But if not, the complaints are baseless, false, and malicious, that will be a problem for St. Luke's; and I will refuse to participate in PULSE and reserve my rights to respond appropriately.  I hope for your understanding.

(Emphasis added.)

36.     On or about July 17, 2015, Thompson forwarded Dr. Rao's discrimination complaints to Mark Stevens ("Stevens"), SLMV's Senior Director Human Resources.  Kytle's response was unknown.  Stevens referred the matter to Stevens' "employee advocate" Ryan DesFosses ("DesFosses").

37.     On or about July 28, 2015, Dr. Rao met with DesFosses to assert Dr. Rao's complaints of discrimination against Drs. Fortuin, Ficklin and Ball.

38.     There was a follow-up meeting during which DesFosses reported that he had spoken with Kytle, Fortuin, Ficklin, and Ball about Dr. Rao's discrimination charges.  According to DesFosses, no one denied Dr. Rao's complaints.

39.     Early in his employment with SLMV, Dr. Rao requested that his employment be converted to a professional services agreement like many other SLMV physicians, including SLMV hospitalist physicians.

40.     About five years after his first request and after he had agreed to participate in the PULSE program, Kytle agreed in September 2015 to change Dr. Rao's employment arrangement.

41.     On or about December 1, 2015, Dr. Rao through his professional limited liability company, JHHR, PLLC, and SLMV signed a Professional Services Agreement ("PSA").  A copy of the PSA is attached to and incorporated by this reference into this Complaint.

42.     Under the PSA, Dr. Rao was to provide hospitalist services to SLMV patients.

43.     The term of the PSA was for three (3) years beginning December 1, 2015.

44.     Paragraph 8.5 of the PSA provided for the Parties' right to terminate the PSA "without cause."  If such termination occurs, the terminating party had to give the other party 90 days' written notice.  If such 90-day notice is given

> "St. Luke's in its sole discretion may waive any or all of the ninety (90) day notice period and require the termination to be effective immediately, in which case St. Luke's sole obligation to [Dr. Rao] shall be to continue to pay [Dr. Rao's] Base Compensation for any portion of the ninety (90) day period waived by St. Luke's or until [Dr. Rao] commences providing professional services elsewhere, whichever occurs earlier."

45.     Paragraph 8.7 of the PSA provides, **Effect of Termination or Expiration; Non-Disparagement** of the PSA provides in part:

> During the term of this Agreement **and at all times thereafter,** the Parties agree **not to make any disparaging statements about each other**, or their directors, officers, and employees, including statements that will call into question the **ethics, morality, quality of clinical services, or business judgment** of the other or its directors, officers or employees.  This requirement is not intended to: i) interfere with the ability of any Party to engage in honest differences of opinion with respect to patient diagnosis/treatment or basic program development that are debated in appropriate forums; or ii) to respond to any appropriate requests for information from any state, local or federal government body; or iii) to exercise the Party's right or obligations to report misconduct under applicable federal or state law.  (Emphasis added.)

46.     Paragraph 10.4 **Dispute Resolution** of the PSA states:

> The Parties shall in good faith attempt to resolve any controversy, dispute or disagreement arising out of or relating to this Agreement, or the alleged breach thereof, by negotiation.  If any such controversy, dispute, or disagreement is not resolved within sixty (60) days of the date it was first identified to the non-complaining Party, that controversy, dispute, or disagreement shall be submitted to non-binding mediation, which

shall be conducted in Twin Falls, Idaho before a mediator acceptable to the Parties, in accordance with informal rules established by the mediator. Each Party shall be responsible for its own fees and costs to participate in mediation. If the controversy, dispute or disagreement is not resolved through mediation, either Party may initiate formal legal action in an Idaho court of proper jurisdiction.

47.     The PSA purported to create an "Independent Contractor" relationship between Dr. Rao and SLMV.

48.     No independent contractor relationship was created under the PSA because:

48.1.     SLMV is involved in the entire process of the hospitalization of any of Dr. Rao's patients. From the moment SLMV's emergency department or transfer center receives the patient, the decision to admit a patient was made between the emergency department physician and a SLMV supervisor. Dr. Rao was not consulted whether to accept the patient based on the patient's clinical condition. Upon information and belief, some patients should not have been admitted to SLMV. Rather they should have been referred to less costly forms of treatment.

48.2.     SLMV was directly involved in all levels of the patient-care decision making process. For example, Dr. Rao has little or no control over the rules SLMV enforces regarding:

48.2.1.  "appropriateness" of documentation;

48.2.2. its organizational "order set use;"

48.2.3. the choice of antibiotics, *e.g.,* daptomycin, tigecycline, imipenem and certain life-saving medications like Kcentra;

48.2.4. its core performance measures;

48.2.5. the length of a patient's stay, with emphasis on keeping the average number of hospital days low for organizational financial purposes; and,

48.2.6. the timeliness of patient contact.

48.3.    SLMV required Dr. Rao to have Internal Medicine board certification, NIHSS stroke certification and ACLS certification to see patients at SLMV.  None of the certifications, including board certification, is required to obtain an Idaho medical license or to practice medicine in Idaho.

48.4.    All facility space, equipment and other personnel were provided by SLMV, including office space, office staff, work station, electronic medical records, work phones, examination rooms, blood pressure cuffs, otoscopes, disposable gowns, blood glucose monitoring equipment, and laboratory equipment.  The physician billing specialists, hospital coders, documentation coaches, social services, nurses and care managers are all employed by SLMV.

48.5.    Dr. Rao's office, shared with other hospital hospitalists, was owned by SLMV.

48.6.    Dr. Rao worked for SLMV for over five years as an employee and slightly more than a year when he was classified as an independent contractor.  Over the six and a half years he worked for SLMV, his primary duties never changed.

48.7.    SLMV retained the right to assign any new additional project to Dr. Rao. Dr. Rao understood that he had to share (without limit) any new patients coming through the emergency department, any patients refused by independent physicians, specialists or surgeons, and patients that another facility wanted to transfer to SLMV and consultations on any patients that another specialist cares for, any time of the day.  Dr. Rao could not refuse these patients. Also, Dr. Rao had to attend all SLMV-required meetings.

48.8.    Dr. Rao had little discretion over when and how long to work.  SLMV required one or more hospitalists to be in the hospital 24 hours a day, 7 days a week, including

holidays.  The shifts were always 12 hours long; starting or ending at 6 a.m. or 6 p.m. SLMV's

hospitalist office coordinator determined Dr. Rao' schedule.

48.9.    SLMV submitted and audited Dr. Rao's billing instead of paying him

based on his actual charges or collections.  It paid him based on relative value units submitted to

SLMV coders for review.

49.    In early October 2015, Dr. Rao began the registration with PULSE.

50.    Later in October 2015, Kytle told Dr. Rao she had received positive comments

from around the hospital about Dr. Rao.  Kytle asked Dr. Rao if he would delay PULSE until

after a hospitalist group survey in early 2016 and then participate with the other hospitalists.  Dr.

Rao agreed.

51.    In late December 2015, after the meeting with Ficklin, Kytle said SLMV wanted

to move ahead with Dr. Rao's PULSE survey in early 2016.  Depending on the results they

would decide whether Dr. Rao should participate in PULSE.  Kytle told Dr. Rao that any

participating physician could select who would evaluate that physician.  Thompson had similarly

informed Dr. Rao of the same process.

52.    In December 2015, nurse practitioner, Fran Willett (Willett) falsely accused Dr.

Rao of not helping her on the night shift with an ICU patient with a high potassium level and that

Dr. Rao told her to wait for repeat blood work before giving any treatment, which led to a delay

in the treatment.  The patient died during the day shift when Willett and Dr. DiRocco failed to

resuscitate the patient.

53.    After Willett's complaint, Dr. Rao met Ficklin in Kytle's office.  Dr. Rao

explained that he had never received a phone call from the ICU and therefore was not aware of

the patient's critical status.  Dr. Rao asked Ficklin to verify the hospitalist physician's phone log

and to provide him a copy, and Ficklin said that he would.  Later, Willett called Dr. Rao but Willett did not inform Dr. Rao of the patient's critical status.  She also said she would take care of the patient and did not need Dr. Rao's help. Ficklin was skeptical of Dr. Rao's explanation, however, the ICU protocols were changed shortly thereafter; ICU nurses had to place all patient-related phone calls directly to the hospitalist physician.  Dr. Rao was never provided a copy of the phone log, which would have supported his explanation.

54.     In February 2016, Dr. Rao was called to discuss the PULSE survey results with Kytle, Dr. Seppi and Thompson.  Dr. Rao did not know a survey had been conducted.  He was still waiting to be given the list of names from which he could select his evaluators.  He had chosen none of the evaluators as other physicians had done.  Instead, SLMV selected evaluators antagonistic to or had filed meritless complaints against Dr. Rao.  Inevitably, the survey results were unfavorable.  These evaluators included Defendant Ficklin, Defendant Fortuin, Dr. Ball, Dr. DiRocco, Willett, and other individual nurses who had complained about Dr. Rao.

55.     The few times anyone lodged a complaint against Dr. Rao, Dr. Rao explained the circumstances to Fortuin or Ficklin.  Neither physician responded to Dr. Rao's explanations. They made no determination that any complaint was valid.

56.     When a complaint was made against him, Dr. Rao requested that SLMV's peer review committee evaluate the complaint.  This never occurred.

57.     Dr. Rao understood that under the Code of Medical Ethics and SLMV's bylaws, peer review was recognized and accepted to promote professionalism and maintain trust.  The peer review process was intended to balance a physicians' right to exercise medical judgment freely with the obligation to do so wisely and temperately.

58.     The peer review process requires fairness in all disciplinary or other hearings where the reputation, professional status, or livelihood of the physician may be adversely affected.

59.     Under the peer review process, physicians involved in reviewing the conduct of fellow professionals are required to:

59.1.   Always adhere to principles of a fair and objective hearing, including:

59.1.1. A listing of specific charges;

59.1.2. Adequate notice of the right of a hearing;

59.1.3. The opportunity to be present and to rebut the evidence; and,

59.1.4. The opportunity to present a defense.

59.2.   Ensure that the reviewing body includes many persons at a similar level of training.

59.3.   Disclose conflicts of interest and, when appropriate, recuse themselves from a hearing.

60.     The only time during his tenure with SLMV that Dr. Rao was involved with SLMV's peer review committee was as a witness where a patient had had an unfortunate surgical outcome.

61.     Never during his employment relationship with SLMV did anyone at SLMV give Dr. Rao a written list of any specific allegations against him.  Any "charges" against Dr. Rao by Willett in December 2015, were oral summaries given by Ficklin and Dr. Miciak.

62.     Never during his employment relationship with SLMV did anyone at SLMV give Dr. Rao a notice of the right of a hearing for any allegations against him.

63.     Never during his employment relationship with SLMV did anyone at SLMV allow Dr. Rao to be present and to rebut the evidence anyone allegedly had against Dr. Rao.

64.     Never during his employment relationship with SLMV did anyone at SLMV allow Dr. Rao to present a defense against any allegation against him.

65.     Initially, in July 2015, when Kytle raised the prospect of Dr. Rao's participation in the PULSE program, Dr. Rao refused because he believed SLMV was discriminating against him and was treating him more negatively than any of his non-Chinese physician peers.

66.     Dr. Miciak had warned Dr. Rao that SLMV and several physicians were looking for ways to terminate his employment.

67.     Eventually, Dr. Rao relented to Kytle's demands and agreed to participate in PULSE.  He agreed because Kytle said she would approve Dr. Rao's long-standing request to change from an employment contract to a professional services agreement and participation would help to "reset" Dr. Rao's relationship with SLMV staff.

68.     Between March and July 2016, Dr. Rao participated in PULSE.  He viewed CDs, took computerized examinations and had regular discussions with a "personal coach."

69.     SLMV unilaterally ended Dr. Rao's PULSE training after July 2016.

70.     Dr. Rao understood that he had successfully completed the PULSE program since he never heard from Thompson again.

71.     SLMV never provided Dr. Rao with the results of his PULSE participation.

72.     On February 7, 2017, Kathy Moore, Regional CEO at St. Luke's sent a letter to Dr. Rao in which she said in part:

> I am pleased to inform you that upon the recommendation of the Medical Staff, the Quality, Safety and Service Excellence Committee of the St. Luke's Regional Board has approved your reappointment application to be credentialed and to perform duties and procedures as outlined in your privileges at

**St. Luke's Magic Valley Medical Center**
**St. Luke's Clinic Coordinated Care, Ltd**
**BrightPath**
**St. Luke's Health Partners.**
Your reappointment will expire on **10/31/2018**
**11/30/2018**
**11/30/2018**Staff Status: **Active**
(Bold and formatting in original)

73.     On February 16, 2017, SLMV sent a letter, signed by Fortuin and Kytle to Dr.

Rao.  The letter said:

> This letter shall serve as notice of the intent of St. Luke's Magic Valley Regional Medical Center, Ltd. ("St. Luke's) to terminate its Professional Services Agreement and Amendment ("Agreement") with JHHR Medical Associates, PLLC ("Company") effective ninety (90) days from receipt of this letter.  For the purpose of this notice, St. Luke's will exercise its right to terminate the Agreement under section 8.5 of the Agreement, "**Termination Without Cause**.".
>
> Effectively [sic] immediately, Company Provider and owner, Dr. James Rao will no longer be required to provide services under the Agreement and will be removed from future scheduling.  However, Company will continue to receive payment for services for a period of ninety (90) days, ending May 20, 2017.  Continued payment for services will be calculated per the Agreement based on the average payment of the last twelve (12) months of service.  These amounts will be paid on the current pay schedule through the end of this termination notice.
>
> (Emphasis added.)

74.     While still working at SLMV and before receiving the termination without cause

notice, Dr. Rao had applied for, been accepted, and had been credentialed to work part-time as a

locum tenens[2] hospitalist physician through Comphealth.

75.     Following his termination without cause, Dr. Rao searched for replacement

employment.  Dr. Rao applied for hospital privileges at North Canyon Medical Center

("NCMC") in Gooding, Idaho.

76.     As part of his credentialing process with NCMC, NCMC asked SLMV for a

facility review of Dr. Rao.

---

[2] Defined by Merriam-Webster: "one filling an office for a time or temporarily taking the place of another —used especially of a doctor or clergyman."

77.     A facility review is an evaluation that a new hospital or insurance company requests from all previous hospitals a physician had been associated with.

78.     On or about May 10, 2017, Ficklin responded to NCMC's request for a facility review.

79.     Ficklin's response was on a form entitled "Forevermore Reference Document" ("Forevermore").

80.     Ficklin completed the Forevermore with checkmarks that disparaged and defamed Dr. Rao that called into question Dr. Rao's ethics, morality, quality of clinical services and business judgment.

81.     Ficklin concluded that, on behalf of SLMV, he, as "Medicine Department Chair" "do not recommend" that Dr. Rao be appointed to NCMC's medical staff.

82.     Because of Ficklin's defamatory and disparaging recommendation, Dr. Rao was forced to withdraw his application at NCMC.

83.     Upon information and belief, a representative of NCMC attempted to contact Ficklin to understand the basis for Ficklin's disparaging Forevermore.  After a month of attempting to reach Ficklin, the NCMC representative learned that Ficklin would only discuss the Forevermore in the presence of his lawyer.

84.     Dr. Rao withdrew his NCMC application because, had the application for credentials been denied by NCMC, the denial would have been reported to the National Practitioner Data Bank ("NPDB"). The NPDB is utilized by every hospital in the United States as part of a physician's credentialing process.  NPDB is a United States Government program that collects and discloses, only to authorized users, negative information on health care

practitioners, including, *inter alia*, malpractice awards, loss of license and adverse clinical privileging actions.

85.    If a physician is reported to the NPDB, the physician's career is severely damaged and often ended.

86.    If the false evaluations in the SLMV/Ficklin Forevermore were reported to the NPDB, it is probable Dr. Rao's career, with a gross value of roughly $9,000,000.00 over his working life would be destroyed.

87.    In December 2017, Dr. Rao filed a charge of race discrimination with the Idaho Human Rights Commission and the Equal Employment Opportunity Commission in which Dr. Rao alleged that Ficklin and Fortuin had discriminated against him.

88.    Upon information and belief, Ficklin and Fortuin knew of the discrimination charges Dr. Rao had filed against them shortly after the charges were filed in December 2017.

89.    In April 2018, Dr. Rao applied, through Medicus Healthcare Solutions ("Medicus") a locum tenens staffing agency, for a hospitalist position with Portneuf Medical Center ("PMC"), Pocatello, Idaho.  He was given temporary medical staff privileges so he could work there before the formal credentialing process was completed.

90.    Dr. Rao worked at PMC under a contract that guaranteed him an hourly rate of $180, plus overtime and holiday premiums.  Dr. Rao worked 12-hour shifts.  The contract prohibited either party to cancel within sixty (60) days of scheduled work.  Dr. Rao had 19 12-hour shifts scheduled through August 2018.

91.    On or about April 20, 2018, Dr. Rao completed an Initial Appointment Application with PMC.  He provided the credentialing information PMC required.

92.     Dr. Rao worked three 12-hour shifts on May 4, 5, and 6, 2018.  On May 8, 2018, Medicus called Dr. Rao and told him PMC had received a "significantly unfavorable evaluation" from SLMV.  Upon information and belief, SLMV submitted the same defamatory and disparaging Forevermore Ficklin sent to NCMC.  Based on that negative evaluation, PMC cancelled Dr. Rao's contract.

93.     Dr. Rao asked about the shifts scheduled within sixty (60) days.  He was told that if he did not agree to voluntarily cancel the contract, PMC would terminate the contract "with cause."  The cancellation would be reported to the NPDB.  Dr. Rao was forced to withdraw his medical staff application.

94.     Upon information and belief, Ficklin was the SLMV employee who signed the disparaging and defamatory evaluation received by PMC.

## FIRST CLAIM FOR RELIEF
### Dr. Rao – Unlawful Retaliation in Violation of Title VII Against SLMC

95.     Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 94.

96.     Dr. Rao reported violations of Title VII in good faith to SLMC.

97.     Dr. Rao filed a charge of discrimination with the EEOC in December 2017.

98.     SLMC took multiple adverse actions against Dr. Rao because of his report of national origin discrimination.  These include, but are not limited to:

    98.1.   specifically falsely criticizing Dr. Rao for patient neglect;

    98.2.   evaluating his performance differently than Caucasian employees;

    98.3.   forcing Dr. Rao to go through the PULSE training when it was unwarranted;

    98.4.   creating a hostile work environment;

    98.5.   accusing Dr. Rao of unseemly behavior based on cultural prejudices;

98.6.    warning him he would be terminated because of his ethnicity;

98.7.    terminating Dr. Rao because of national origin bias; and,

98.8.    post-termination slander to derail his applications for credentials.

99.    Defendant's retaliation and ultimate termination of Dr. Rao is causally linked to his protected activity of complaining about discrimination.

100.    Dr. Rao has been damaged because of SLMC's retaliation.  He is entitled to recover all resulting damages including lost pay and benefits, future lost pay and benefits, punitive and emotional distress damages in amounts to be proven.

101.    Dr. Rao is also entitled to all reasonable attorneys' fees and costs in bringing this action.

## SECOND CLAIM FOR RELIEF

### Dr. Rao – Hostile Work Environment in Violation Against SLMC

102.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 101.

103.    Dr. Rao's colleagues' and supervisors' actions towards Dr. Rao were sufficiently severe and/or pervasive to create a discriminatory hostile work environment that SLMC condoned and fostered.

104.    Dr. Rao reported harassment against him based upon his national origin and race. Despite this, SLMC failed to take adequate remedial measures to prevent this ongoing unlawful harassment within the workplace.

105.    Dr. Rao has been damaged because of SLMC's failure to promptly remedy the known harassment.  He may recover all resulting damages including lost pay and benefits, future lost pay and benefits, punitive and emotional distress damages in amounts to be proven.

106.    Dr. Rao is also entitled to all reasonable attorneys' fees and costs in bringing this action.

### THIRD CLAIM FOR RELIEF
### Dr. Rao – Unlawful Retaliation in Violation of 42 U.S.C. § 1981 Against Defendants SLMC, and Ficklin and Fortuin in Their Individual Capacities

107.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 106.

108.    Dr. Rao reported discrimination and harassment in violation of 42 U.S.C. § 1981 in good faith to SLMC.  Specifically, he reported that he was singled out for discrimination and harassment because of his race and national origin.

109.    Dr. Rao filed a charge of discrimination with the EEOC in December 2017.

110.    SLMC took multiple adverse actions against Dr. Rao because of his report of national origin discrimination.  These include, but are not limited to:

110.1.  specifically falsely criticizing Dr. Rao for patient neglect;

110.2.  evaluating his performance differently than Caucasian employees;

110.3.  forcing Dr. Rao to go through the PULSE training when it was unwarranted;

110.4.  creating a hostile work environment;

110.5.  accusing Dr. Rao of unseemly behavior based on cultural prejudices;

110.6.  warning him he would be terminated because of his race and ethnicity;

110.7.  terminating Dr. Rao because of national origin bias;

110.8.  continuing post-termination defamation and disparagement to derail his applications for credentials; and,

110.9.  continuing post-termination defamation and disparagement intended to damage his profession and career.

111.    Upon information and belief, SLMC has a custom and policy of retaliating against those who report unlawful discrimination in violation of 42 U.S.C. § 1981.

112.    Defendants' retaliation and ultimate termination of Dr. Rao is causally linked to his protected activity.

113.    Dr. Rao has been damaged because of SLMC's failure to promptly remedy the known harassment.  He may recover all resulting damages including lost pay and benefits, future lost pay and benefits, and emotional distress damages in amounts to be proven.

114.    Dr. Rao is also entitled to all reasonable attorneys' fees and costs in bringing this action.

115.    Dr. Rao is also entitled to punitive damages against the individual Defendants as they acted maliciously or with reckless disregard to his rights.

**FOURTH CLAIM FOR RELIEF**
**Dr. Rao – Unlawful Retaliation in Violation of 42 U.S.C. § 1981 Against Defendants SLMC, and Ficklin and Fortuin in Their Individual Capacities**

116.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 115.

117.    Dr. Rao was born in China.

118.    Defendants SLMC, Ficklin and Fortuin knew that Dr. Rao was harassed due to his race, ancestry or ethnic characteristics and failed to take adequate measures to end the harassment.

119.    The racial harassment was sufficiently severe and/or pervasive to create a discriminatory hostile work environment.

120.    Upon information and belief, SLMC has a custom and policy of failing to ensure a harassment-free workplace and failing to take measures to prevent ongoing harassment.

121.    Defendants SLMC, Ficklin and Fortuin subjected Dr. Rao to adverse employment actions based on his race and national origin.

122.    These actions materially affected Dr. Rao's employment.

123.    Dr. Rao has been damaged because of SLMC's failure to promptly remedy the known harassment.  He may recover all resulting damages including lost pay and benefits, future lost pay and benefits, and emotional distress damages in amounts to be proven.

124.    Dr. Rao is also entitled to all reasonable attorneys' fees and costs in bringing this action.

125.    Dr. Rao is also entitled to punitive damages against the individual Defendants as they acted maliciously or with reckless disregard to his rights.

**FIFTH CLAIM FOR RELIEF**
**JHHR Medical Associates, LLC – Breach of Contract against St. Luke's Magic Valley**
**Regional Medical Center and Ficklin-Disparagement**

126.    Plaintiffs allege and incorporate the allegations in paragraphs 1 to 125.

127.    The PSA between JHHR Medical Associates, LLC and SLMV was a valid and enforceable contract between competent parties; for a lawful purpose; for valid consideration; and, by agreement by the parties to the PSA's essential terms.

128.    During and after Dr. Rao's termination without cause, Defendant Ficklin, was an agent of SLMV and his conduct regarding completing the Forevermore response to Dr. Rao's credentialing application to NCMC and PMC was not within the scope of his authority and relate to the duties he was asked or expected to perform on behalf of SLMV.

129.    Defendants were obligated under paragraph 8.7 during and after the term of the PSA not to make any disparaging remarks about Dr. Rao.

130.    Ficklin's Forevermore statements about Dr. Rao's professional competency to NCMC as an agent of SLMV were disparaging statements that called into question Dr. Rao's ethics, morality, quality of clinical services, and his business judgment.

131.     Ficklin's unfavorable comments about Dr. Rao's professional competency to PMC as an agent of SLMV were disparaging remarks as defined by the PSA.

132.     Ficklin's disparaging remarks to NCMC and PMC breached the PSA.

133.     Ficklin's disparaging remarks to NCMC and PMC were material breaches of the PSA.

134.     As a direct and proximate result of Defendants' breaches of contract, JHHR Medical Associates, LLC was damaged in amounts to be proven.

135.     Defendants' acts were an extreme deviation from reasonable standards of conduct and were performed by Defendants with malice, wantonness and gross negligence that will entitle Plaintiff to an award that will punish Defendants and deter Defendants and others from engaging in similar conduct.

## SIXTH CLAIM FOR RELIEF
### JHHR Medical Associates, LLC – Breach of Contract against St. Luke's Magic Valley Regional Medical Center and Fortuin

136.     Plaintiffs allege and incorporate the allegations in paragraphs 1 to 135.

137.     The PSA between JHHR Medical Associates, LLC and SLMV was a valid and enforceable contract between competent parties; for a lawful purpose; for valid consideration; and, by agreement by the parties to the PSA's essential terms.

138.     During and after Dr. Rao's termination without cause, Defendant Fortuin, was an agent of SLMV and his conduct regarding administering the PSA to PMC was not within the scope of his authority and relate to the duties he was asked or expected to perform on behalf of SLMV.

139.    On February 7, 2017, Dr. Rao was reappointed to his position as hospitalist based on the "recommendation of the Medical Staff, the Quality, Safety and Service Excellence Committee of the St. Luke's Regional Board."

140.    Upon information and belief, Fortuin's termination of Dr. Rao without cause was a carefully considered artifice to conceal the true reason for terminating Dr. Rao.

141.    Upon information and belief, the true reason for terminating Dr. Rao was to retaliate because he brought discrimination charges against SLMC's hospitalist staff members, in breach of the PSA contract.

142.    As a direct and proximate result of Defendants' breaches of contract, JHHR Medical Associates, LLC was damaged in amounts to be proven.

143.    Defendants' acts were an extreme deviation from reasonable standards of conduct and were performed by Defendants with malice, wantonness and gross negligence that will entitle Plaintiff to an award that will punish Defendants and deter Defendants and others from engaging in similar conduct.

**SEVENTH CLAIM FOR RELIEF**
**JHHR Medical Associates, LLC -Breach of the Covenant of Good Faith and Fair Dealing Against all Defendants**

144.    Plaintiffs allege and incorporate the allegations in paragraphs 1 to 143.

145.    The PSA between JHHR Medical Associates, LLC and SLMV was a valid and enforceable contract between competent parties; for a lawful purpose; for valid consideration; and, by agreement by the parties to the PSA's essential terms.

146.    The PSA required the parties to perform in, good faith, the obligations required by the PSA.

147.     The disparaging evaluations given to NCMC and PMC nullified and/or impaired the benefits of the Plaintiff under the PSA.

148.     The wrongful termination of the PSA nullified and/or impaired the benefits under the PSA.

149.     SLMC's performance of under the PSA was undertaken in bad faith.

150.     As a direct and proximate result of Defendants' lack of good faith performance of the PSA, Plaintiff was damaged in amounts to be proven.

**EIGHTH CLAIM FOR RELIEF**
**Dr. Rao – Defamation Against St. Luke's Magic Valley Regional Medical Center and Ficklin**

151.     Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 150.

152.     When Ficklin responded with the Forevermore form to NCMC's request to evaluate Dr. Rao, Ficklin acted as SLMC's agent.

153.     When Ficklin responded to PMC's request to evaluate Dr. Rao, Ficklin acted as SLMC's agent.

154.     The evaluations and statements Ficklin communicated to NCMC and PMC were false.

155.     The evaluations and statements Ficklin communicated to NCMC and PMC impugned Dr. Rao's honesty, integrity, virtue, and reputation.

156.     The evaluations and statements Ficklin communicated to NCMC and PMC accused Dr. Rao of behavior incompatible with the proper conduct of his business, trade and profession.  Ficklin's evaluations and statements were libelous *per se.*

157.     As a direct and proximate result of Defendants' libel *per se*, Dr. Rao has been damaged in amounts to be proven.

## NINTH CLAIM FOR RELIEF
### Dr. Rao – Defamation Against Ficklin Individually

158.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 157.

159.    When Ficklin responded with the Forevermore form to NCMC's request to evaluate Dr. Rao, Ficklin was acting outside the scope of his employment with SLMC.

160.    When Ficklin responded to PMC's request to evaluate Dr. Rao, Ficklin was acting outside the scope of his employment with SLMC.

161.    The evaluations and statements Ficklin communicated to NCMC and PMC were false.

162.    The evaluations and statements Ficklin communicated to NCMC and PMC impugned Dr. Rao's honesty, integrity, virtue, and reputation.

163.    The evaluations and statements Ficklin communicated to NCMC and PMC accused Dr. Rao of behavior incompatible with the proper conduct of his business, trade and profession.  Ficklin's evaluations and statements were libelous *per se.*

164.    As a direct and proximate result of Defendants' libel *per se*, Dr. Rao has been damaged in amounts to be proven.

## TENTH CLAIM FOR RELIEF
### Dr. Rao – Tortious Interference with Contract Against St. Luke's Magic Valley Regional Medical Center and Ficklin

165.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 164.

166.    When Ficklin responded to PMC's request to evaluate Dr. Rao, Ficklin acted as SLMC's agent.

167.    Upon information and belief, when Ficklin, on behalf of SLMC, responded with a defamatory evaluation, SLMC and Ficklin knew Dr. Rao had an economic relationship with PMC of a benefit to Dr. Rao.

168.    In response to PMC's request to evaluate Dr. Rao, Defendants wrongfully gave false and libelous information to PMC.

169.    In responding to PMC's request for an evaluation of Dr. Rao, Defendants intended to disrupt Dr. Rao's economic relationship with PMC or knew that the disruption was likely because of their conduct.

170.    Defendants' response to PMC's request for evaluating Dr. Rao, destroyed the economic relationship between Dr. Rao and PMC.

171.    The destruction of the economic relationship between Dr. Rao and PMC economically damaged Dr. Rao.

172.    As a direct and proximate result of Defendants' tortious interference with Dr. Rao's contract with PMC, Dr. Rao was damaged in amounts to be proven.

## ELEVENTH CLAIM FOR RELIEF
### Dr. Rao – Tortious Interference with Contract Against Ficklin Individually

173.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 172.

174.    When Ficklin responded to PMC's request to evaluate Dr. Rao, Ficklin was acting outside the scope of his employment with SLMC.

175.    Upon information and belief, when Ficklin, responded with a significantly unfavorable evaluation, Ficklin knew Dr. Rao had an economic relationship with PMC of a benefit to Dr. Rao.

176.    In response to PMC's request for evaluating Dr. Rao, Ficklin wrongfully gave false and libelous information to PMC.

177.    In responding to PMC's request for an evaluation of Dr. Rao, Ficklin intended to disrupt Dr. Rao's economic relationship with PMC or knew that the disruption was likely because of his conduct.

178.    Ficklin's response to PMC's request for evaluating Dr. Rao, destroyed the economic relationship between Dr. Rao and PMC.

179.    The destruction of the economic relationship between Dr. Rao and PMC economically damaged Dr. Rao.

180.    As a direct and proximate result of Defendant's tortious interference with Dr. Rao's contract with PMC, Dr. Rao was damaged in amounts to be proven.

181.    Ficklin's acts were an extreme deviation from reasonable standards of conduct and were performed by Ficklin with malice, wantonness and gross negligence that will entitle Dr. Rao to an award that will punish Ficklin and deter him and others from engaging in similar conduct.

## TWELFTH CLAIM FOR RELIEF
### Dr. Rao – Tortious Interference with Prospective Economic Advantage Against St. Luke's Ficklin Individually

182.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 182.

183.    Dr. Rao had a valid economic expectancy with NCMC.  Had Dr. Rao been credentialed at NCMC, he would have continued to pursue his career as a hospitalist.

184.    Dr. Rao had a valid economic expectancy with PMC.  He was in a contract for hospitalist services with PMC.

185.    Ficklin knew of the economic expectancy Dr. Rao had with NCMC since he sent the Forevermore form to NCMC.

186.    Ficklin knew that Dr. Rao had an economic expectancy for the remaining term of his career and that the likely gross amount of that expectancy was roughly $9,000,000.00.

187.    Ficklin knew of the economic expectancy Dr. Rao had with PMC since, upon information and belief, he sent the Forevermore form to PMC.

188.    Ficklin's intentional interference induced Dr. Rao to withdraw his application for employment with NCMC.

189.    Ficklin's intentional interference induced PMC to demand that Dr. Rao cancel his contract with PMC.

190.    Ficklin's intentional interference with Dr. Rao's expectancy to complete the remainder of his career without fear he would be not be able to be credentialed in any medical facility in the United States because he was listed with the NPDB.

191.    Ficklin's intentional interferences were wrongful because they were based on false, defamatory, and disparaging statements made with malice.

192.    As a direct and proximate result of Ficklin's intentional interferences, Dr. Rao has been damaged by not being employed by NCMC, by having to cancel his contract with PMC, and by having his career disrupted and ruined by the threat of being referred to the NPDB.

193.    Ficklin's intentional interferences with Dr. Rao's prospective advantages were extreme deviations from reasonable standards of conduct and were performed by Ficklin with malice, wantonness and gross negligence that will entitle Plaintiff to an award that will punish Ficklin and deter him and others from engaging in similar conduct.

194.    As a direct and proximate result of Ficklin's intentional interferences with Dr. Rao's prospective advantages, Dr. Rao has suffered damages in amounts to be proven.

## THIRTEENTH CLAIM FOR RELIEF
### Dr. Rao – Tortious Interference with Prospective Economic Advantage Against St. Luke's Magic Valley Regional Medical Center and Ficklin

195.    Plaintiff, Dr. Rao alleges and incorporates the allegations in paragraphs 1 to 194.

196.    Dr. Rao had a valid economic expectancy with NCMC.  Had Dr. Rao been credentialed at NCMC, he would have continued to pursue his career as a hospitalist.

197.     Dr. Rao had a valid economic expectancy with PMC.  He was in a contract for hospitalist services with PMC.

198.     Defendants knew of the economic expectancy Dr. Rao had with NCMC since Ficklin acted as an agent of SLMV and sent the Forevermore form to NCMC.

199.     Defendants knew that Dr. Rao had an economic expectancy for the remaining term of his career and that the likely gross amount of that expectancy was roughly $9,000,000.00.

200.     Defendants knew of the economic expectancy Dr. Rao had with PMC since, upon information and belief, Ficklin acted as an agent of SLMV and sent the Forevermore form to PMC.

201.     Defendants' intentional interference induced Dr. Rao to withdraw his application for employment with NCMC.

202.     Defendants' intentional interference induced PMC to demand that Dr. Rao cancel his contract with PMC.

203.     Defendants' intentional interference with Dr. Rao's expectancy to complete the remainder of his career without fear he could not be credentialed in any medical facility in the United States because he was listed with the NPDB.

204.     Defendants' intentional interferences were wrongful because they were based on false, defamatory, and disparaging statements made with malice.

205.     As a direct and proximate result of Defendants' intentional interferences, Dr. Rao has been damaged by not being employed by NCMC, by having to cancel his contract with PMC, and by having his career disrupted and ruined by the threat of being referred to the NPDB.

206.     Defendants' intentional interferences with Dr. Rao's prospective advantages were extreme deviations from reasonable standards of conduct and were performed by Ficklin as SLMV's agent with malice, wantonness and gross negligence that will entitle Plaintiff to an award that will punish Defendants and deter Defendants and others from engaging in similar conduct.

207.     As a direct and proximate result of Defendants' intentional interferences with Dr. Rao's prospective advantages, Dr. Rao has suffered damages in amounts to be proven.

## ATTORNEYS' FEES

208.     Dr. Rao is entitled to an award of attorneys' fees and costs for violations of Title VII of the Civil Rights Act of 1964, under 42 U.S.C. § 2000e-5(k).  Dr. Rao is entitled to an award of costs and attorneys' fees for his 42 U.S.C. § 1981 race discrimination claim under 42 U.S.C. § 1988.  JHHR Medical Associates, LLC is entitled to an award of attorneys' fees under Idaho Code § 12-120(3) because the causes of action arose out of a contract.  Plaintiffs are entitled to an award of costs and attorneys' fees under Federal Rule of Civil Procedure 54.

## PRAYER FOR RELIEF

209.     **WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award this relief:

209.a.  Back pay and benefits, in amounts to be determined;

209.b.  Compensatory (emotional distress) and consequential damages;

209.c.  Punitive damages as allowable;

209.d.  Pre-judgment and post-judgment interest at the highest lawful rate;

209.e.  Attorneys' fees and costs, including expert witness fees;

209.f.   An award to allow for any adverse tax consequences that may occur because of any lump-sum award of damages; and,

209.g.   Any such further relief as justice allows.

### PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Plaintiffs respectfully demands a trial by jury on all issues.

DATED THIS 26th day of June, 2018.

THOMAS, WILLIAMS & PARK, LLP


_____/s/ William H. Thomas_____
William H. Thomas
Attorney for Plaintiff